UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
Nos. 15-3863/15-3864/15-3865/15-3866


PROMETHEUS RADIO PROJECT

     V.

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA

HOWARD STIRK HOLDINGS, LLC,
     Petitioner in No. 15-3863

*(Amended per Clerk Order of March 14, 2016)

(Caption Continues)


          Transcript from the audio recording

of the oral argument held Tuesday, April 19, 2016,

at the United States Courthouse, 601 Market Street,

Philadelphia, Pennsylvania.  This transcript was

produced by James DeCrescenzo, a Fellow of the

Academy of Professional Reporters, a Registered

Diplomate Reporter, an Approved Reporter of the

United States District Court.


BEFORE:

     THE HONORABLE THOMAS L. AMBRO

     THE HONORABLE JULIO M. FUENTES

     THE HONORABLE ANTHONY J. SCIRICA

1    (Caption Continued)

2    PROMETHEUS RADIO PROJECT

3          V.

4    FEDERAL COMMUNICATIONS COMMISSION;
     UNITED STATES OF AMERICA
5
     NEXSTAR BROADCASTING, INC.,
6          Petitioner in No. 15-3864
     *(Amended per Clerk Order of March 14, 2016
7
                          - - -
8
     PROMETHEUS RADIO PROJECT
9
           V.
10
     FEDERAL COMMUNICATIONS COMMISSION;
11   UNITED STATES OF AMERICA

12   NATIONAL ASSOCIATION OF BROADCASTERS,
           Petitioner in No. 15-3865
13   *(Amended per Clerk Order of March 14, 2016)

14                        - - -

15   PROMETHEUS RADIO PROJECT

16         V.

17   FEDERAL COMMUNICATIONS COMMISSION;
     UNITED STATES OF AMERICA
18
     PROMETHEUS RADIO PROJECT,
19         Petitioner in No. 15-3866
     *(Amended per Clerk Order of March 14, 2016)
20

21

22

23

24

**JAMES DeCRESCENZO REPORTING, LLC**

```
 1    APPEARANCES:

 2    ANGELA J. CAMPBELL, ESQUIRE
      campbeaj@law.georgetown.edu
 3    INSTITUTE FOR PUBLIC REPRESENTATION
      GEORGETOWN LAW
 4    600 New Jersey Avenue, N.W.
      Washington, D.C. 20001
 5
           And
 6
      HELGI C. WALKER, ESQUIRE
 7    hwalker@gibsondunn.com
      GIBSON, DUNN & CRUTCHER
 8    1050 Connecticut Avenue, N.W.
      9th Floor
 9    Washington, D.C. 20036
      202.955.8500
10
           And
11
      PATRICK F. PHILBIN, ESQUIRE
12    patrick.philbin@kirkland.com
      KIRKLAND & ELLIS
13    655 15th Street, N.W.
      Suite 1200
14    Washington, D.C. 20005
      202.879.5030
15         Counsel for Petitioners

16

17    DAVID M. GOSSETT, ESQUIRE
      david.gossett@fcc.gov
18    FEDERAL COMMUNICATIONS COMMISSION
      Office of General Counsel
19    445 12th Street, S.W.
      Washington, D.C. 20554
20    202.418.0980
           Counsel for Respondents
21

22

23

24
```

**JAMES DeCRESCENZO REPORTING, LLC**

1        THE COURT:  Prometheus Radio Project,

2  and there's a host of others, but numbers 15-3863,

3  64, 65, and 66.  And we'll start off with

4  Ms. Campbell.

5        MS. CAMPBELL:  Thank you, your Honor.

6  May it please the Court, my name --

7        THE COURT:  You're not asking for any

8  uninterrupted time.  It's the people who come after

9  you; is that correct?

10        MS. CAMPBELL:  Well, I believe we --

11  both sides were granted five minutes, so I would

12  have five minutes.  They're splitting their five

13  minutes.

14        THE COURT:  I have Ms. Walker with two

15  minutes of uninterrupted plus five minutes

16  additional, and I have Mr. Philbin with three

17  minutes of uninterrupted and five minutes

18  additional; so it's seven and eight, which is 15,

19  and you have 15.  Do you want some uninterrupted?

20        MS. CAMPBELL:  I would like it, your

21  Honor.  I read the Court's order as giving both

22  sets of petitioners five minutes of uninterrupted

23  time.  But obviously if you have questions I'm

24  happy to answer them.

1          THE COURT:  On your side, then, there

2   is five minutes, two and three.  Did you want more

3   than five minutes of uninterrupted?

4          MS. CAMPBELL:  No, five minutes should

5   be plenty, but I would like to reserve two minutes

6   of my time for rebuttal.

7          THE COURT:  Oh, not a problem at all.

8          Go right ahead.

9          MS. CAMPBELL:  Okay.  Thank you.

10         As this court found in the Public

11  Citizen vs. Chao case, there comes a time when the

12  Court must let an agency know that enough is

13  enough.  That time has come in this case.

14         Despite prior remands from this court

15  in 2007 and 2011 specifically directing the FCC to

16  analyze the impact of its ownership limits on

17  ownership by minorities and women, the FC --

18         THE COURT:  Assume for the moment that

19  we granted some type of relief --

20         MS. CAMPBELL:  Yes.

21         THE COURT:  -- under, let's say, APA

22  706, and it went back and the idea was you've

23  delayed, you need to do something.  What would be

24  the timeline you would suggest that they come up

1  with that something?

2           MS. CAMPBELL:  Well, we would suggest

3  that by June 1st that the FCC at that point make

4  sure that it has all of the data that it needs,

5  that it has analyzed the most recent filings --

6           THE COURT:  So you're assuming the

7  Third Circuit comes out with opinions that quickly?

8  I mean, we have met the enemy and they are us.

9           MS. CAMPBELL:  Well, you're not as

10  slow as the FCC, I'll say that.

11           THE COURT:  Touché.

12           THE COURT:  And not as fast as the

13  Supreme Court.

14           MS. CAMPBELL:  They should, in the

15  process, also report the results and not just total

16  numbers, but identify which stations they believe

17  are controlled by women or minorities by call sign

18  and market.

19           They should also have the database up

20  and running so that people can easily analyze this

21  data and cross-reference it and aggregate it.

22           And it should also reinstate the

23  requirement that people who would be considered

24  attributed owners but for the fact that there are

```
 1   certain exceptions --

 2            THE COURT:  Well, the FCC's

 3   explanation is that it has been unable to complete

 4   and analyze the data that's necessary for it to

 5   comply with Prometheus II.

 6            MS. CAMPBELL:  Well, it's true that

 7   their data --

 8            THE COURT:  You're suggesting a 60-day

 9   period; is that right?

10            MS. CAMPBELL:  Well, I'm suggesting a

11   60-day period for the data that was collected in

12   December, which they have not yet reported on at

13   all.  And I'm suggesting that hopefully that data

14   is more accurate than the data from the years

15   before.

16            But they also have ways they can make

17   it more accurate by going back to the stations that

18   didn't file, for example, and telling them they

19   have to file.  Or if they didn't file correctly,

20   get the correct information.

21            But part of the problem here is that

22   the Commission says in its brief, and they said it

23   elsewhere, that the chairman intends to have an

24   order ready for the Commission to vote on by the
```

1   end of June.

2           And, yet, in February of this year the

3   Commission put out an order in the diversity

4   docket, which is part of these combined cases,

5   where it basically admitted that they had no way to

6   verify the accuracy of the data that had been filed

7   in every other year since they started requiring

8   this information in 1998 because stations had not

9   used a unique identifier which you need to be able

10  to aggregate the data.

11          So the Commission is now adopting a

12  new way of filing the data that should solve that

13  problem.

14          THE COURT:  Do you think it has the

15  data now that it --

16          MS. CAMPBELL:  I think it has enough

17  data to know that there's a problem.  And I think

18  it has enough data to be able to analyze what the

19  current state is, as well as to identify whether

20  any of the policies that it has, that had been

21  intended to permit opportunities for minorities and

22  women, have actually been successful.  That's

23  something they still haven't done.

24          For example, they reinstated the

1    failing station rule but they -- there's no

2    evidence that that actually has any effect, mostly

3    because stations don't have to use it because they

4    enter into these contractual relationships instead

5    of trying to sell the station.

6              THE COURT:  I'm sorry.  Could you pull

7    the microphone down just a little bit?

8              MS. CAMPBELL:  I'm sorry.

9              THE COURT:  That's good.  Thanks.

10             Were you moving into the FSA area or

11   are you --

12             MS. CAMPBELL:  Well, I would like to

13   stick a bit with what the possible --

14             THE COURT:  Okay.

15             MS. CAMPBELL:  -- remedy is.

16             THE COURT:  You go ahead.

17             MS. CAMPBELL:  Okay.  So --

18             THE COURT:  Is it your suggestion

19   that -- forgetting timeline if this were to go

20   back -- that we order or ask the FCC to adopt a

21   different definition of eligible entities, or would

22   it also be allowable for them to say look, we just

23   can't do it, it can't be done in this climate, so

24   we're not going to adopt anything.

1          MS. CAMPBELL:  I think they have to

2   evaluate whether the policies they have now are

3   working.  There's no dispute here that diversity is

4   important in public interest policy.  There's no

5   dispute that there are very few stations controlled

6   by women and minorities.

7          So I think the Commission can't just

8   say well, you know, there's nothing we can do about

9   it, because they haven't really tried.

10          THE COURT:  But the argument in the

11   past has been because there's a perception that

12   Attaran puts up a roadblock.

13          MS. CAMPBELL:  Well, Adarand would

14   require the Commission to meet strict scrutiny if,

15   and only if, they have a system of rules that would

16   take race or -- race really, because -- strict

17   scrutiny is not applied to gender -- into account

18   and --

19          THE COURT:  Would it mean taking into

20   account individual differences as well, looking at

21   each case?

22          MS. CAMPBELL:  Part of the problem

23   here is the Commission doesn't really have

24   comparative licensing anymore.  There are very few

1  licenses that are ever going to be given out.  In

2  fact, we're going to lose licenses with the

3  auction.

4         But as far as like the failed station

5  rule, the purpose of that was if you have a station

6  that's in a small market -- usually that's not

7  doing well -- and they could sell it, they have to

8  make that known -- they have to actually try to

9  sell it so that a new owner could come in and take

10  over before they could sell to someone in the

11  market.  And in order to sell to someone in the

12  market, they need to get a waiver from the FCC.

13         THE COURT:  But how does that advance

14  the diversity?

15         MS. CAMPBELL:  The Commission's theory

16  is that it makes it easier for new entrants to find

17  out when stations are available, and these stations

18  are going to be available at lower rates because

19  they're not doing that well, and that gives them an

20  opportunity to get into that market.  These markets

21  are very consolidated.

22         THE COURT:  It gives anybody an

23  opportunity to get into that market.

24         MS. CAMPBELL:  It gives everybody an

1    opportunity, exactly.  And that's why the

2    Commission has to look to see if are people using

3    this rule and who's buying them when they do use

4    it.

5              THE COURT:  Does this not then hurt

6    some of the smaller stations that are diverse if

7    they're in economic difficulty if we're going to

8    press in this direction?  This gets us into the SSA

9    issue.

10             MS. CAMPBELL:  That's exactly what I

11   was referring to, your Honor.

12             THE COURT:  Okay.

13             MS. CAMPBELL:  As I understand the

14   broadcasters' argument is, they want to have these

15   SSAs and JSAs because these stations are failing.

16   But if the stations are failing, they have a way to

17   deal with it.

18             To say, well, if the public interest

19   can only be served by five TV stations instead of

20   eight TV stations, that's a substantive question

21   that the Commission has not addressed in this order

22   under review.

23             They've only addressed the procedural

24   questions about under what circumstances should

1    these contractual relationships be attributed.

2              THE COURT:  Ms. Campbell, what if the

3    FCC gets up in a couple of minutes and says we just

4    can't do this by May or June, it's going to take us

5    a whole lot more time.  It's going to take us maybe

6    a year.  What would be the remedy?

7              MS. CAMPBELL:  Well, I mean, they've

8    been saying they were going to do this all along,

9    so I -- I don't have a whole lot of sympathy for

10   them.

11             THE COURT:  In Prometheus II we didn't

12   really give them a time frame within which to

13   complete that order.

14             MS. CAMPBELL:  Your Honor, you did say

15   that they must do it during the course of the 2010

16   quadrennial review, which although is not spelled

17   out, I would assume means like within -- before the

18   2014 started.

19             THE COURT:  It's like the Delaware

20   general assembly stopping the clock at midnight and

21   not going through.

22             In Public Citizen Health Research

23   Group vs. Chao, a 2002 case from our court, the

24   claim was -- and the Court ruled -- that there was

1    too much delay.

2              We also said we don't really know how

3    much time we should give.  And an option is for the

4    parties to agree to mediation of what the timeline

5    should be.  Is that something that's worthwhile

6    considering here?

7              MS. CAMPBELL:  Absolutely, your Honor.

8    I think that would be a good idea.  I mean, we made

9    estimates based on both trying to imagine what was

10   possible for the FCC but also making some

11   meaningful progress.

12             And we're certainly happy to sit down

13   with the FCC and talk about that further and try to

14   see if we can agree upon a schedule.

15             THE COURT:  On the JSAs Mission,

16   intervenor Mission has a different view about their

17   efficacy.  And they seem to think that the JSAs, as

18   currently employed, are helpful to minorities and

19   women.

20             Why do you disagree with them?  Or why

21   are they wrong?

22             MS. CAMPBELL:  I'm happy to tell you.

23   So Nextstar and Mission have essentially been

24   partners since the late 1990s.  At that time

1    Mission was not controlled by women, it was

2    controlled by the husband of the woman who now owns

3    the stations.

4              And they have agreements for all, I

5    think, 16 of their stations plus some low-power

6    stations under which Nextstar operates Mission

7    stations.  They provide all of the local news, they

8    sell all of the advertising time, they share their

9    facilities, they basically provide -- do everything

10   involved in running the station except for hold the

11   licenses.  Mission continues to hold the licenses.

12             So in that particular case, this did

13   nothing to promote -- the JSAs had nothing to do

14   with promoting female ownership.

15             And in addition, having female

16   ownership in a case where the owner is not involved

17   or in terms of producing local news, it really

18   doesn't contribute to that local diversity which is

19   the whole underlying theory of having the top four

20   prohibition; that you want to have the major

21   stations separately owned so they're going to have

22   separate newscasts covering different perspectives

23   and providing the public with different viewpoints.

24             Now as far as -- I'm sorry.

1           THE COURT:  And so we consider -- do

2   we go beyond the fact of ownership?  We also

3   consider the programming itself when we're thinking

4   about diversity, or is ownership enough?

5           MS. CAMPBELL:  The whole idea of

6   ownership is that if the owners control the

7   content:  They control the programming, they

8   control the finances, they control -- they hire

9   their personnel.

10          And that's why these agreements get

11  around that, because they basically transfer all of

12  those functions to another entity in the same

13  market except for the license itself.  And they

14  have to keep, I think, two employees usually.

15          But basically that station doesn't

16  have its own studio, doesn't have a tower, can't

17  produce any of its own programming.

18          THE COURT:  Good.  Of course.  And

19  that's not the representation that the companies

20  have made, at least according to the GAO report.

21          MS. CAMPBELL:  I'm not sure.  The GAO

22  report found, by looking at the FCC's public files,

23  that there are about 86 of joint services, joint

24  sales agreements, excuse me, that had been filed in

1    the public files.

2            So there may be -- and, in fact, I'm

3    sure there are -- many other situations where they

4    might not reach the 15 percent threshold but

5    they're still going to be controlling the actual

6    programming, the actual local news programming,

7    because that's not going to be 15 percent of the

8    total per station's programming.

9            The local news is the most profitable

10   part of the station's programming.  And I could

11   cite you specific examples where I know -- for

12   example, in Honolulu -- that you have one company

13   that controls two of the network affiliates and a

14   third station, both violating the rules, and puts

15   the same news on all three stations.

16            THE COURT:  Thank you.

17            THE COURT:  One last question.  Could

18   you specify for me which of the FCC's actions or

19   inactions you claim violate our Prometheus II

20   remand?

21            MS. CAMPBELL:  Okay.  The failure to

22   analyze how the rules they have now, how they

23   impact opportunities for minorities and women to

24   acquire stations.

1          You know, we -- in an ideal world we

2     think the rules should be stricter than they are.

3     But they also need to analyze any proposed changes,

4     and they have made some proposed changes in the

5     2014 quadrennial, that could have an impact that

6     has to be analyzed.

7          And then I think they also have to,

8     try to adopt, if they can -- if they think there's

9     still a problem, which I think there is, how

10    else -- if they can't solve that problem through

11    tightening the ownership limits or -- they can --

12    they should really seriously look at whether or not

13    they can have some sort of socially disadvantaged

14    business or other.  There may well be other ways to

15    do it.

16          And, in fact, I'm actually a little

17    bit less excited about SDBs than we used to be

18    because I don't think there's going to be a whole

19    lot of opportunities to actually apply that concept

20    because there's going to be -- we're going to end

21    up with fewer stations, not more stations.

22               THE COURT:  Okay.  Thank you.

23               THE COURT:  Thank you.

24               MS. CAMPBELL:  Thank you very much.

1          THE COURT:  Ms. Walker.

2          MS. WALKER:  Good afternoon.  May it

3    please the Court, Helgi Walker for the broadcast

4    petitioners on the Section 202(h) issue.

5          THE COURT:  Did I refer to you at the

6    beginning by your first name as opposed to your

7    last name?

8          MS. WALKER:  My last name is Walker.

9          THE COURT:  That's right.  Did I say

10   Helgi by mistake?

11         MS. WALKER:  I didn't notice it, your

12   Honor.

13         THE COURT:  Anyway, I know now.  I

14   know it's Walker.  I'm sorry.

15         MS. WALKER:  It's Ms. Walker, yes.

16   Thank you.

17         I have reserved one minute of my time

18   for rebuttal if that's acceptable to the Court.

19         THE COURT:  That's fine.  And you have

20   some uninterrupted time.

21         MS. WALKER:  Two minutes, per your

22   clerk's office.

23         The FCC concedes that it has not made

24   the determination of continued necessity that

1    Section 202(h) requires.  Thus, it has now been

2    almost a decade since the Commission actually

3    finished a review of the broadcast ownership rules.

4    As a result, many of the rules have remained

5    unchanged for almost 40 years.

6             For example, the newspaper broadcast

7    ownership rule is exactly the same as when it was

8    first adopted in 1975, and the local TV ownership

9    rule is still around, even though the D.C. Circuit

10   invalidated it 14 years ago.  Meanwhile, the

11   Internet has completely transformed competition in

12   the media industry.

13            So this is not a case about the

14   subtleties of agency discretion.  This is a case

15   about the blatant and systematic nullification of

16   Section 202(h).

17            As you explained in Prometheus I,

18   Congress intended to create an ongoing mechanism to

19   ensure that the rules would keep pace with

20   competitive change.  But the Commission is openly

21   defying that directive.

22            To make judicial review meaningful and

23   to honor congressional intent, the appropriate

24   remedy for the 202(h) violation is vacatur.  Absent

1    such relief, the broadcast petitioners will

2    continue to be subject to admittedly unjustified

3    restrictions that hamper our ability to compete in

4    the marketplace and our core legal injury will go

5    unremedied.

6            Mediation may be appropriate for

7    Prometheus but not for us.  Unlike them, we have

8    challenged the existing rules as violative of

9    mandatory statutory requirements.

10            THE COURT:  Let me ask you:  Usually

11    there's a scale on which you go up.  You say, okay,

12    706, get them to move more quickly.  Next might be

13    a writ of mandamus, to put it in the vernacular,

14    like we really do mean it.  And then if they ignore

15    that, then possibly vacatur.

16            You've gone for the home run here.

17    You haven't even asked for either of the first two.

18    Why?

19            MS. WALKER:  Your Honor, that's

20    because 202(h) imposes a mandatory duty on the

21    Commission; it shall review its rules and it shall

22    make the necessary determinations.

23            THE COURT:  But that's also why 706 is

24    there, is it not?

1          MS. WALKER:  That's correct.  And the

2  D.C. Circuit, in circumstances that were less

3  egregious than here, vacated the cable broadcast

4  cross ownership rule because the Commission had

5  given a flimsy reason for retaining it.

6          Here the Commission has given no

7  reason at all.  That's not only violative of

8  202(h), that's arbitrary and capricious.

9          THE COURT:  But the D.C. Circuit,

10  going all the way back to Allied Signal in '93, has

11  said you have to look at the disruptive

12  consequences.

13          MS. WALKER:  And also the gravity of

14  the error, your Honor.  And to just blow off 202(h)

15  is pretty extreme.

16          THE COURT:  But to go your way would

17  be like Armageddon, wouldn't it?

18          MS. WALKER:  Not at all, your Honor.

19          THE COURT:  It would be complete

20  deregulation, would it not?

21          MS. WALKER:  Your Honor, the

22  Commission would be free to readopt the rules and

23  the Commission could adopt the transition period.

24          But I would just point out, we've been

1    waiting for ten years for the Commission to do a

2    review.  The 2010 review was six years past.  The

3    record in the 2014 review has been closed for a

4    year and a half and we have no reason to think

5    anything is happening at the Commission.

6              THE COURT:  It's an awful -- it's an

7    awful lot of work on the part of the Commission, it

8    seems to me, on the part of the judiciary, and

9    many, many lawyers that have been involved in this

10   case, to all of a sudden just scuttle the whole

11   thing and start all over.  Just in that context, it

12   just doesn't make sense.

13             MS. WALKER:  If the Commission had

14   focused on the job that Congress gave it to do,

15   none of us would have had to expend any of these

16   resources in the first place.

17             But to the extent you're not persuaded

18   by our request for vacatur, we also, in our brief,

19   noted that you could remand.  But we would ask you

20   to impose fairly strict conditions here, again

21   given that the 202(h) violation is not a

22   discretionary rule-making question like the one in

23   Public Citizen or even Prometheus's request.

24             THE COURT:  So if we were to -- let's

1    assume that we're not going to vacate.

2              MS. WALKER:  Yes, sir.

3              THE COURT:  But we might do something

4    else.

5              MS. WALKER:  Yes.

6              THE COURT:  What is that something

7    else that gets this back on track so that the

8    Commission is able to do the job that Congress

9    expected it to do and what this court thought was

10   going to be done in the prior cases here?

11             MS. WALKER:  We would ask you to

12   remand with three specific conditions in your

13   order.  First, to impose a time limit on the FCC so

14   that they make the necessary determinations under

15   202(h) and repeal or modify any rule that doesn't

16   meet the requisite standards.  We think 60 days

17   from the issuance of the Court's opinion would be

18   appropriate.

19             Second, we would ask --

20             THE COURT:  Maybe they'll come up and

21   tell us when they're going to get this done.  My

22   fear is we're going to end up with Prometheus IV.

23             MS. WALKER:  I think the more strict

24   you are now, Judge Fuentes, the less likely we are

**JAMES DeCRESCENZO REPORTING, LLC**

1    to wind up with Prometheus IV, with all due

2    respect.

3              THE COURT:  Maybe they'll let us know

4    what their plans are.

5              MS. WALKER:  Well, it's been a year

6    and a half since the record in the 2014 review was

7    closed, and absolutely nothing has happened.

8              And quite shockingly, not even the

9    prospect of judicial review has moved the

10   Commission to action, when we think they might

11   have, as sometimes happens, come forward with an

12   order saying we're actually taking steps.

13             But apparently not even the prospect

14   of this court's inquiry spurred them to do

15   anything.

16             But the second condition on a remand

17   that we would respectfully request is an interim

18   stay of the rules to incentivize the Commission to

19   promptly act.

20             This is much like what you did in

21   Prometheus I where you issued a stay of the rules

22   there pending your review, and then you maintained

23   that stay in place pending remand.

24             The third thing we would ask for in a

1    remand order is a clear statement from this court,

2    again, so that perhaps we won't wind up here again,

3    your Honor.  A clear statement that if the

4    Commission does not timely act, this court will at

5    that time vacate the rules.

6            THE COURT:  Like Core Communications.

7            MS. WALKER:  A little bit like Core

8    Communications except again, this is a mandatory

9    statutory duty, unlike those other cases.

10           THE COURT:  If we were to vacate or

11   even to stay, what does that do to the JSAs?  Does

12   that wipe them out, or make them ineffective

13   anymore?

14           MS. WALKER:  No, your Honor.  That's a

15   separate question, the JSA rule, which my colleague

16   Mr. Philbin will address, was adopted in a separate

17   order.  And that is a new rule.

18           Our challenge goes to the rules that

19   existed at the time, and we believe were improperly

20   retained without any reasoned analysis at all, by

21   the Commission simply refusing to do the job that

22   Congress told it to do.

23           THE COURT:  Are you aware of any other

24   case where an entire regulatory scheme like this

1    has been struck down?

2              MS. WALKER:  No, your Honor, but

3    that's because 202(h) is pretty unusual, and the

4    Commission's delay is pretty extreme.  And this is

5    a case where, again, the Commission didn't just

6    fail to give a reasoned analysis, which this court

7    required in Prometheus I based on its reading of

8    what 202(h) requires.

9              The Commission gave no analysis at

10   all.  And at joint appendix 2 of the order, they

11   said we are cognizant of our duty to do this every

12   four years.  And then they went on and simply

13   didn't do it.  I think that is pretty extreme.

14             But Public Citizen is highly

15   instructive.  There you ordered OSHA to adopt a

16   rule, which is a very unusual judicial

17   intervention.  And those rules were purely

18   discretionary, and there was no mandatory statutory

19   deadline at issue in that case.

20             So, here, ordering vacatur would

21   really just be the flip side of your order to adopt

22   a rule there, because here, of course, we're

23   dealing with existing rules that have not been

24   reviewed in light of competition, again for almost

1  ten years, despite the fact that the Internet has

2  absolutely changed the way in which broadcasters

3  compete in this new media landscape.  And we are

4  the only participants in that market that are

5  saddled by these kinds of restrictions.

6              THE COURT:  Thank you.

7              THE COURT:  The argument, of course,

8  from the FCC is we're working on it.  We just don't

9  have enough information at this time to be able to

10 come up with a decision.  But we're not -- it's not

11 that we put it into a drawer and are not looking at

12 it any longer.

13             MS. WALKER:  Well, Prometheus and we

14 come from very different places, but I think one

15 thing we agree on is the Commission has had plenty

16 of time to do its job.  I think six years is long

17 enough.

18             The Commission's very active in other

19 areas that don't include any statutory mandate, and

20 for some reason this just never happens.  And the

21 reasons they gave -- the order, by the way, didn't

22 propose a contrary reading of 202(h), your Honor.

23 The order just gave excuses for why the Commission

24 couldn't do it.

1          One of them, quite remarkably, was the

2    pace of competitive change in the media landscape.

3    That's the very reason that Congress wanted these

4    rules to be reviewed, and so they could be updated,

5    as this court said in Prometheus II.

6          The other reasons they gave were the

7    global financial crisis and the spectrum auction,

8    which now appears to be delayed until 2017.  We

9    wouldn't accept those answers from our teenage

10   children about why they hadn't done their homework.

11         THE COURT:  Is that a fact, that the

12   auction that was scheduled for June, this June?

13         MS. WALKER:  The chairman testified in

14   the Senate last month that that could roll into

15   2017, and it will take at least 39 months to

16   transition the broadcasters out of that spectrum.

17         And if the Commission's theory is we

18   need to study the effects of the auction on the

19   broadcast market that -- we're talking four, five

20   years from now, we would be well into what is

21   supposed to be the 2018 review at that time.

22         THE COURT:  Thank you very much.

23         MS. WALKER:  Thank you.

24         THE COURT:  Mr. Philbin.

 1                    MR. PHILBIN:  Thank you, your Honor.

 2   May it please the Court, Patrick Philbin for the

 3   broadcast petitioners to address the JSA

 4   attribution rule, and I'd like to reserve one

 5   minute of my time.

 6                    THE COURT:  That's fine.

 7                    MR. PHILBIN:  Thank you, your Honor.

 8                    THE COURT:  You're arguing that the

 9   FCC can't expand its ownership rules without first

10   determining that the existing rules are in the

11   public interest.

12                    But the logical outgrowth of that

13   seems to be that the Commission can't even enforce

14   its existing rules without making a public interest

15   determination.  Is that correct?

16                    MR. PHILBIN:  Well, your Honor, I

17   think that's not a necessary outgrowth of the

18   argument on the JSA attribution rules.  There are

19   really two sources of the statutory constraint on

20   the FCC here.  Both impose a public interest

21   standard on the FCC.

22                    One is the general rule-making

23   authority in Section 303(r), which is the original

24   source for all of the FCC's ownership rules.

 1   Congress imposed a public interest standard there.

 2   So the general grant of background rule-making

 3   authority in Title III imposes a public interest

 4   standard.

 5                Then, in addition, 202(h) imposes a

 6   constraint here because the JSA rule was adopted as

 7   part of the periodic review.

 8                And under Section 202(h) the mandatory

 9   directive there, that the Commission shall

10   determine whether its rules are necessary in the

11   public interest, means that it cannot expand a rule

12   as part of a periodic review, where, as here, it

13   has both failed to make the public interest

14   determination that's necessary to retain the

15   television ownership rules in the first place, and

16   refused to consider the public interest effects of

17   the particular expansion of the rule at issue.

18                THE COURT:  And they say they're going

19   to do it, though, later on when they deal with the

20   ownership rules.

21                MR. PHILBIN:  But, your Honor, that's

22   saying we'll regulate now and consider the public

23   interest later, and that's not an approach that

24   Congress has permitted.  Congress and this court

1    made the constraints of 202(h) very clear in

2    Prometheus I.

3              In Prometheus I, the Court explained

4    that in a periodic review under 202(h), the

5    Commission is required to determine whether its

6    then - extant rules remain useful in the public

7    interest.

8              And then it held -- it went on to

9    explain exactly what that means saying, quote, No

10   matter what the Commission decides to do to any

11   particular rule, retain, repeal or modify, whether

12   to make more or less stringent, it must do so in

13   the public interest and support its decision with a

14   reasoned analysis, end quote.

15             The JSA rule cannot survive under that

16   standard.

17             THE COURT:  And the remedy you seek is

18   that we vacate the rule as not having been

19   determined to be in the public interest?

20             MR. PHILBIN:  Correct, your Honor.

21   Because, remember, this is an adoption -- this

22   is -- unlike the situation that Ms. Walker was

23   addressing, the failure to act, this is an adoption

24   of a new rule.  This is a new constraint imposed on

1    broadcasters.

2              It means that arrangements that were

3    lawful before are now unlawful.  And the Commission

4    made that determination, made that decision, it

5    adopted that rule without considering the effect it

6    would have on the public interest.

7              It said we don't have to consider that

8    now, that does not affect our analysis, it's not

9    relevant.  That's JA-168 at footnote 1105.  Public

10   interest is not relevant; it's something we'll

11   consider later.

12             And that approach of regulate now and

13   consider the public interest later violates the

14   clear directives of both 303(r) and 202(h).

15             THE COURT:  Why is it not a natural

16   outgrowth, which is what the FCC says, of the

17   ownership rules and the ownership rules they claim

18   are being end runned by these attribution rules and

19   so they had to do something in order to effectively

20   enforce the ownership rules?

21             MR. PHILBIN:  Even if that were the

22   agency's approach, your Honor, the agency cannot

23   adopt what is effectively an expansion of the

24   ownership rules.

1            The attribution rules simply define

2    what ownership means, for purposes of the ownership

3    restriction.  And it -- this creates an expanded

4    definition so that arrangements that were lawful

5    before are now unlawful.

6            The Agency cannot do that without

7    considering the public interest.  It is the

8    irreducible minimum, core requirement under this

9    statute, for the FCC to consider the public

10   interest of every rule that it adopts.

11           THE COURT:  But if the ownership rules

12   are reviewed and readopted, this JSA rule would

13   seem to be an integral part of the ownership rules.

14           Any impediment on the part of the FCC

15   including it in its review?  I mean, if what you

16   say is right, the rule can be vacated, but it can

17   be reinstated in the review process.

18           MR. PHILBIN:  It could be reinstated

19   if the FCC gave appropriate notice and did its job

20   correctly and considered the public interest.

21           I think one thing to bear in mind,

22   your Honor, if you go back to the 2002 biennial

23   review where a similar rule was adopted for radios,

24   for radio JSAs, which this court reviewed in

 1    Prometheus I, paragraph 321 of that order is the

 2    critical paragraph where the FCC weighed the public

 3    interest benefits of radio JSAs and determined that

 4    the benefits there were outweighed by other

 5    considerations.

 6             The agency didn't do that here.  It

 7    did exactly the opposite with a very different

 8    approach.

 9             The agency said here we don't have to

10    consider the public interest benefits of television

11    JSAs.  We're going to say they're attributable now,

12    and some later time, when we get to the 2014

13    quadrennial review -- which we still don't know

14    when it's ever going to be completed -- that's when

15    we'll consider the public interest.

16             That is simply not an approach that's

17    permissible.  And even if the agency could adopt

18    this rule if it did the public interest analysis,

19    it doesn't mean this rule can be salvaged now when

20    it's on review, because the agency didn't do that,

21    and it can't try to salvage it at this point.

22             THE COURT:  I gather you have another

23    argument, and that is there simply was no record

24    support that these rules were being used to

1    circumvent the ownership rules in the way that the

2    FCC claims they were.

3            That was a pretty strong statement

4    that you made.  And you stand by that, that the

5    record evidence is not there?

6            MR. PHILBIN:  We do stand by that,

7    your Honor, and it was also -- the exact same

8    assessment was made by Commissioner Pai in his

9    dissent, because he pointed out that the FCC, and

10   this is at JA-227, did not identify a single

11   example of a situation where a JSA exercised --

12   where a station in a JSA exercised undue influence

13   over another station or a single instance where a

14   JSA has allowed one station to influence a single

15   programming decision of another station.

16           And I would point the Court in

17   particular to the National Fuel Gas Supply vs. FERC

18   case which was cited by Mission Broadcasting.

19           Because there the D.C. Circuit pointed

20   out that professing that an order ameliorates a

21   real industry problem but then citing no evidence

22   demonstrating that there is, in fact, an industry

23   problem is not reasoned decision making.

24           That's exactly what the Commission was

1    doing here.  Now the Commission can in some cases

2    rely on its expertise, but it still has to be tied

3    to evidence in the record.  That's the basic rule

4    of reasoned decision making:  Tying the decision

5    from facts found to the choice made.

6           When there are no facts, when the

7    agency doesn't actually have anything to point to

8    showing that this influence materialized in the

9    real world, it has nothing factual in the record to

10   tie its decision to.  And that's one of the many

11   reasons the JSA rule was arbitrary and capricious.

12          We've also explained in our brief,

13   your Honor, it's arbitrary and capricious also

14   because the agency failed to consider the public

15   interest benefits of JSAs, which do, in fact,

16   promote female and minority ownership.  And by

17   decreasing costs for stations in small to mid-size

18   markets, they reduce barriers to entry.

19          And petitioner Howard Stirk has

20   explained that its JSAs with Sinclair Broadcast

21   Group have enabled it to create one of the few

22   African-American owned full power broadcast

23   stations in the country.  That's due to the cost

24   savings that come from JSAs.

1          All of those benefits, promoting

2     minority ownership, female ownership, promoting

3     local news programming that wouldn't otherwise be

4     possible, promoting investment in capital items

5     like Doppler radar which is providing vital

6     services to communities, all of that couldn't be

7     done --

8               THE COURT:  Mr. Philbin, I have one

9     more question for you.  Can the FCC separately

10    adopt the JSA rule without necessarily justifying

11    its ownership rules?

12               MR. PHILBIN:  Your Honor, let me

13    answer that in sort of two stages, if I may.  If we

14    just put 202(h) to one side for a second, could the

15    Commission at some point issue an NPRM and say

16    we're going to consider expanding our attribution

17    rule and went through notice and comment and made

18    the necessary determination, yes, it could.

19               Now, in a 202(h) periodic review

20    though, when it's doing that periodic review and it

21    is under a mandate to determine whether its

22    existing rules are necessary in the public

23    interest, then no, it may not, because the agency

24    has to first determine that the existing rule is

 1   still in the public interest before it can expand

 2   that rule.

 3         It would be logically incoherent --

 4   and this I believe is part of the reason the agency

 5   didn't do this -- it would be logically incoherent

 6   to come out and say we can't determine whether the

 7   local television ownership rule is in the public

 8   interest or not.  But we can determine that making

 9   this expansion to the rule is in the public

10   interest.

11         Thank you, your Honor.

12         THE COURT:  Good.

13         THE COURT:  Mr. Gossett.

14         MR. GOSSETT:  Thank you, your Honor.

15   David Gossett for the Federal Communications

16   Commission.

17         If it's okay with the Court, I would

18   like to start with the Joint Sales Act agreement

19   issue that Mr. Philbin --

20         THE COURT:  Why don't we start with,

21   why so long in delaying?

22         MR. GOSSETT:  Happy to start there if

23   that's where you would like me to, your Honor.

24         THE COURT:  This is like deja vu all

 1    over again.

 2                    MR. GOSSETT:  Your Honor, when the

 3    Commission was confronted with the resolving its

 4    2010 quadrennial review, it determined that it was

 5    unable to reach a resolution at that time.  What

 6    the Commission did was merge --

 7                    THE COURT:  All the way back to '04,

 8    we said then we expect a prompt action.  What's

 9    causing the delay?  Just in plain words, what's

10    causing the delay here?

11                    MR. GOSSETT:  I'm not sure it's fair

12    to go back to 2004, your Honor.  This is a --

13                    THE COURT:  Whatever the delay, what

14    is causing the delay?

15                    MR. GOSSETT:  We resolved the 2006

16    quadrennial review and this court reviewed it and

17    affirmed, in large part, our decisions on those

18    rules.  So Ms. Walker's allegations that those

19    rules are sort of extraordinary and very dated I

20    think is very --

21                    THE COURT:  You seem to be dancing

22    around the question.  I'm just as interested in

23    Judge Ambro's question as I guess all of us are.

24    When are you going to get it done and what is

```
 1   taking so long?

 2              MR. GOSSETT:  The Chairman committed

 3   to having an order resolving both the 2010 and 2014

 4   quadrennial reviews and this court's remand of the

 5   diversity order circulated to the five

 6   commissioners of the FCC by June 30, 2016, and he

 7   is still intending to do so.

 8              So an order addressing all of the

 9   issues here should be before the entire Commission

10   within 73 days.

11              THE COURT:  Within 73 days.

12              MR. GOSSETT:  Seventy-three days from

13   today.

14              THE COURT:  How long --

15              MR. GOSSETT:  The Commission at that

16   point will have to, of course, review that and

17   discuss it, and it will take some amount of time

18   for the full Commission to adopt such an order, but

19   at the time the Commission voted to merge the 2010

20   and 2014 quadrennial reviews, the Chairman made

21   that commitment.

22              He made that commitment at that time

23   in the order, he made that commitment to Congress,

24   and he plans to keep that commitment, so.
```

1        THE COURT:  Assume that we do grant

2    some type of relief under 706 but we don't know

3    what the timeline should be, would this case be

4    akin to what I asked Ms. Campbell about, which is

5    under Public Citizen Health, our 2002 case, I think

6    it was a 2002 case, to have the parties agree and

7    perhaps be a mediation to agree on what a

8    reasonable time should be?  Because I'm not sure I

9    can tell you what it should be.

10        MR. GOSSETT:  Respectfully, I think

11    this case is much more similar to the Oil Chemicals

12    case that predated Public Citizen v. Chao in that

13    by the time this court confronted the Public

14    Citizen v. Chao case, OSHA had repeatedly given

15    specific dates by which they were going to issue a

16    notice of proposed rule making and repeatedly

17    missed those dates.

18        We're not in the same circumstance.

19    The Commission here has strived valiantly to

20    address both the questions with respect to the

21    quadrennial reviews and the separate questions with

22    respect to the eligibility definition, and had --

23    admittedly this court didn't fully agree with the

24    Commission's results in Prometheus II, but we have

1    taken that into consideration in the proceedings on

2    remand.

3              But the only plausible deadline that

4    we have missed is arguably we've missed a deadline

5    with respect to the 2010 quadrennial.

6              But that's far afield from a situation

7    in which the Commission has repeatedly missed

8    deadlines.  We're trying.  We're trying hard.

9    We're working very hard at it.

10              So I don't actually think this is a

11    situation in which this court's mandamus review

12    would be appropriate.

13              THE COURT:  Well, this would be --

14    let's start with 706.  Let's say we don't do

15    mandamus.  But what would be a reasonable time?

16    What do you project would be a reasonable time that

17    you could commit to here today?

18              MR. GOSSETT:  Well, I'll talk about

19    706 in a second, but on a schedule, again, I

20    don't -- as I said, the Commission plans to have an

21    order circulated in June.

22              It certainly will take some months for

23    the Commission to fully adopt that.  I think we're

24    not talking in terms of years, we're talking about

1    in terms of months before the Commission would

2    realistically have an opportunity to resolve the

3    question.

4                    THE COURT:  And to the extent you can,

5    what would you suggest today would be the number of

6    months beyond June 30?

7                    MR. GOSSETT:  It's a multimember body.

8    It's hard to bind them.  I'd rather not say that it

9    will be resolved by a certain date because --

10                   THE COURT:  Would you be opposed to

11   talking with the other side as to what a reasonable

12   time should be and if there can't be agreement,

13   then possibly somebody doing what happened in Chao,

14   which is trying to help you along?

15                   MR. GOSSETT:  If the Court orders

16   mediation, we'll go through with it.  I mean, in

17   Chao the mediation was actually not successful.

18   The parties were unable to reach an agreement and

19   the panel eventually issued a schedule allowing two

20   years for the notice of proposed rule making and

21   another couple of years after that for an actual

22   order.

23                   So even at the time when they were

24   issuing that order, it was four more years before

1    that rule making was resolved.  And I do want to

2    point this court to the Court's International Union

3    case, which at 361 F.3d 255 notes that the Chao

4    decision was very much motivated by the fact that

5    human lives and health were at stake.  So we're not

6    in a situation like that at all.

7              But on Section 706, respectfully, I

8    don't think Section 706 gives this court

9    jurisdiction to grant that sort of relief.  The

10   FCC's orders are reviewed subject to the Hobbs Act.

11   The Supreme Court is clear that the APA is itself

12   not a jurisdictional statute.  That's the Califano

13   case.

14             So to the extent that this court has

15   jurisdiction, it's under the Hobbs Act under which

16   it reviews final orders.

17             THE COURT:  Well, let's get specific.

18   If we want -- if somebody says that you have overly

19   delayed, delayed by a big margin, coming up with a

20   definition of eligible entities, what is the relief

21   they can possibly get?

22             MR. GOSSETT:  They could get an order

23   to do so by a date certain.  That goes to

24   Ms. Walker's arguments with respect to the court

1    ordered review.

2            I mean, the relief available under 706

3    is clearly simply an order to do something by a

4    certain date.  That's the Supreme Court's Norton

5    case.

6            THE COURT:  And I was saying to you,

7    what is your projection?  Sounds like you're

8    saying -- if it's a matter of months, are you

9    saying the end of this year?

10           MR. GOSSETT:  I think that it's

11   reasonable to presume that the Commission would be

12   able to adopt an order by the end of this year.  On

13   the questions --

14           THE COURT:  How does the Commission

15   interpret -- I believe Ms. Walker was making

16   reference to this.  In 202, the phrase, the

17   Commission shall review -- this is Congress's

18   directive -- shall determine, and shall repeal.

19   How does the Commission interpret the word "shall"?

20           MR. GOSSETT:  As mandatory, your

21   Honor.  But nothing in Section 404 says four years

22   and we have to jump off a cliff.  The question is

23   what should the Commission do in a circumstance

24   where they were unable to --

1          THE COURT:  You can't keep kicking the

2   can down the road.  "Shall," to me, it seems very

3   imperative.

4          MR. GOSSETT:  I agree, your Honor, but

5   two things:  First, we've only missed, at most, one

6   quadrennial review deadline.  We're only talking

7   about the 2010 quadrennial on that.

8          So even if we're in the realm of an

9   analysis of what to do for an agency missing a

10  deadline under the TRAC factors that this court

11  looked at in Chao, a statutory deadline is only one

12  of a number of factors that the Court is supposed

13  to look at to decide in a comprehensive analysis

14  whether the Court needs to step in.

15         Beyond that, here the Commission is

16  working hard on the quadrennial review remand and

17  on the diversity issues and has -- the Chairman has

18  committed to having an order circulate by June 30

19  to the full Commission.

20         The question becomes, Judge Fuentes,

21  in response to your question, what should the

22  Commission do in a circumstance where it determines

23  that, based on the staleness of the record,

24  inability to delay, et cetera, they're unable to

1    come up with an order that they can defend one way

2    or the other.

3            So that's the situation where what the

4    Commission did was merge these two to try to get us

5    back on track, as I believe it was Judge Ambro at

6    one point said.  We're trying to get back into a

7    situation where we can do these on the quadrennial

8    obligation, quadrennial schedule.

9            But at this point the best way to do

10   that is to let us issue that order, I would say.

11           THE COURT:  What needs to be done in

12   order for you to either adopt an eligible entities

13   definition, either the socially and economically

14   disadvantaged business might be one option or

15   overcoming disadvantages preference might be

16   another option.

17           But how much more information do you

18   need to come to a conclusion as to which way to go?

19   Adarand, which has been put up a number of times,

20   has been around now for what, 21 years?

21           MR. GOSSETT:  The Commission

22   tentatively concluded in the further notice that it

23   cannot adopt another definition besides the

24   eligibility definition, that it doesn't have the

1    record to do so.  And since we were last here --

2                THE COURT:  But a lot of studies have

3    been done.  How many more studies -- I mean, this

4    is --

5                MR. GOSSETT:  That's the point, your

6    Honor.  We've done a lot of studies.  They don't

7    show evidence sufficient to take that action.  I

8    mean, let me step back for a second.

9                The Commission has identified two

10   interests that might be sufficient to satisfy

11   strict scrutiny.  That might be a compelling

12   interest under the Supreme Court precedent.

13               THE COURT:  Well, strict scrutiny

14   would apply to race but not as to gender.

15               MR. GOSSETT:  Right.  Let's stick to

16   race for one second.  Those are advancing viewpoint

17   diversity or remedying past discretion.  It's clear

18   that we can't take an action specifically for the

19   purpose of increasing minority ownership.  That is

20   not itself a compelling governmental interest.

21               The compelling governmental interest

22   that the Commission has identified is advancing --

23   that increasing minority ownership might advance is

24   advancing viewpoint of diversity.

1          The Commission has now undertaken or

2   contracted for a number of studies and those

3   studies simply just don't show the relevant

4   relationship.

5          So there are at least 12 studies that

6   have been done since we were -- that are in the

7   record since we were last here, or 11 in the record

8   and one that's ongoing.  Seven of the 11 studies

9   that are already fully in the record address

10  questions of minority ownership.

11         Two of them specifically looked at the

12  relation between minority ownership and viewpoint

13  diversity and they didn't show a statistically

14  significant benefit.  So we're studying the

15  question.  So --

16         THE COURT:  Excuse me.  If that, in

17  fact, is your conclusion within a four-year period,

18  are you obligated then to say we can't make the

19  link, and therefore we're not going to do anything?

20         And you've made a determination, and

21  then you may get appealed on that.  Maybe there is

22  something in the record and it's up to a court to

23  decide.

24         But don't you have to make some

1    decision?  Either we're going to modify or vacate

2    or we're going to say no, for whatever reason we're

3    not going to make a change, period.

4            MR. GOSSETT:  The Further Notice

5    proposes actual -- proposes readopting the eligible

6    entity definition and not doing more than that.

7    And, that, the Chairman has committed to resolving

8    that by July --

9            THE COURT:  But we're in the proposal

10   stage.  We're in the tentative finding stage.

11   That's -- I think that's the frustrating part of

12   this.

13           MR. GOSSETT:  Your Honor, the Court

14   gave us four specific assignments, I think, in

15   Prometheus II, all of which I think we've now done

16   but they hadn't been fully resolved by 2014.

17           But the Court also linked, ordered us

18   to link our review of those issues with the ongoing

19   quadrennial review issue, which raises its own set

20   of complications, and it has largely been the cause

21   of delay here is the issues about the five rules.

22           But as to the Court's obligations, you

23   told to us improve the data, and that's something

24   that Ms. Campbell focused on.  We have done a huge

1    amount on that since the Commission was last here.

2            The Commission has not only flyspecked

3    existing data, it has released an order resolving

4    three of the four pending further notices on the

5    323 data.  It has held workshops on how to fill out

6    those forms.  It has held workshops on how to use

7    those forms to study minority ownership.  We've

8    done a lot on the data.

9            THE COURT:  Is there a point at which

10   you can say we've got enough data to make a

11   decision?

12           MR. GOSSETT:  The Commission will make

13   a decision in the order here as to the record

14   today.  If someone were to study the question again

15   and come up with a different analysis in the

16   future, we could revisit that.

17           If the Supreme Court were to change

18   its precedent we could revisit that.  But, yes, I

19   mean, the order that --

20           THE COURT:  It just seems to me that

21   you can always say, well, we need a little bit more

22   information, we don't have enough, and you're just

23   building delay on top of delay.

24           I mean, I'm just thinking at some

1    point you have to say we've got enough, we've got

2    what we need, and we can make a decision.

3              MR. GOSSETT:  Decisions are made at a

4    given point in time.  They can always change over

5    time.  But the proposal in the further notice --

6    and the Commission hasn't yet adopted it -- but, I

7    mean, at that point the Commission spent 40 pages

8    explaining why at that point, based on the record

9    before the Commission, it did not think it could

10   take an explicitly race or gender-conscious action

11   and it should nonetheless readopt the eligible

12   entity.

13             I'm sorry, your Honor.

14             THE COURT:  What is the problem?  Is

15   it that you have to expand the field that you need

16   input from?  Or is it that -- what is the nature of

17   the problem?

18             MR. GOSSETT:  I'm not sure which

19   problem --

20             THE COURT:  What's causing you not to

21   act?

22             THE COURT:  What's keeping you from

23   making a decision?

24             MR. GOSSETT:  Well, we're doing it as

```
 1    part of a quadrennial review, as this court
 2    instructed, and that --
 3              THE COURT:  But that's gone on for --
 4              MR. GOSSETT:  -- and that restarted in
 5    2014 and so we're --
 6              THE COURT:  But what's causing you not
 7    to act?  Forget where it started.  What's causing
 8    you not to make a decision?
 9              MR. GOSSETT:  The Commission intends
10    to make a decision.
11              THE COURT:  No.  No.
12              MR. GOSSETT:  Sorry.  I'm not sure
13    --
14              THE COURT:  What's causing it to be
15    delayed so far?
16              MR. GOSSETT:  On the quadrennial
17    review we determined that the record was inadequate
18    to resolve the question and restarted it.
19              THE COURT:  What is inadequate in the
20    record?  I mean, look, I'll come back to what I was
21    going to say after that.
22              You've been up here now 15 minutes.
23    We don't know what's causing the problem.  You're
24    saying that the data is inadequate.
```

```
 1              What data are you missing and what

 2    further data are you seeking, in progress?  When do

 3    you anticipate that being done?  What do you think

 4    it's likely to show?  I have no clue as to where

 5    you're coming from.

 6              MR. GOSSETT:  I'm sorry.  Your Honor,

 7    if I suggested the data was inadequate, that was

 8    not what I meant to say.  What I said was that this

 9    court, in Prometheus II, said to improve the data

10    the Commission collects on minority ownership and

11    that we have done so.

12              I separately said that we have studied

13    the relationship between minority ownership

14    diversity and viewpoint diversity and, to date, no

15    study has shown the kind of relationship between

16    those that could lead us to take an explicitly

17    race-based action.  And no one has proposed another

18    study that we think would do so.

19              So the Commission has tentatively

20    concluded that it can't, based on what we know

21    about the world, take those explicitly race-based

22    actions at this time.

23              THE COURT:  But you say "tentatively

24    concluded."  So you're insulating yourself from a
```

1    final order.

2              MR. GOSSETT:  Your Honor, I say

3    tentatively concluded because, to go back to where

4    we started, we're here on a further notice of

5    proposed rule making, not an order.

6              If we had -- when the Commission

7    resolves this order after it circulates in 73 days,

8    there will be an order, I am sure we will be

9    challenged on it, and I expect we'll be before here

10   and we can speak more definitively about what the

11   Commission has concluded on the evidence.

12             I'm not able to speak for the full

13   Commission on something that they haven't yet

14   decided.  I can just discuss what the Commission

15   has done -- and we've done a lot -- and what the

16   Commission has tentatively concluded, and ask for

17   further comment on and that, I've said, suggests

18   that we should reinstitute the eligible entity

19   definition and not adopt the socially disadvantaged

20   person definition.

21             I do want to address one other thing

22   that this court specifically said in Prometheus II

23   we should do with respect to diversity, because I

24   want to discuss how we have done that too, despite

1    what Ms. Campbell suggested.

2              The Court suggested that we should

3    look at our diversity -- at our ownership rules,

4    the five rule subject to 202(h) and discuss the

5    effects of those rules and on potential changes to

6    those rules on minority and female ownership.

7              And the Commission does that in the

8    further notice.  It discusses each of those rules,

9    it discusses evidence about whether those rules do

10   or do not affect minority ownership and what

11   changes to those rules might do to minority

12   ownership, and concludes that the rules, in fact,

13   don't have significant effect on minority ownership

14   issues.

15             But that was another separate

16   obligation that this court put on us that we have

17   undertaken and are continuing to undertake.

18             THE COURT:  Just to clarify, you say

19   your quadrennial review will be completed within 73

20   days.  Did I get that right?  Or within 73 days it

21   will be before the full Commission?

22             MR. GOSSETT:  It will be before the

23   full Commission.

24             THE COURT:  So you have a specific

1    date in mind, I gather.

2            MR. GOSSETT:  Oh, I'm sorry.  Yes.

3    The Chairman committed to circulating the order by

4    June 30, 2016.

5            THE COURT:  Okay.

6            MR. GOSSETT:  And plans to do so.

7            THE COURT:  And for the definition of

8    "eligible entities," what are the options you're

9    currently considering?

10            MR. GOSSETT:  The Further Notice --

11    talks about the eligibility definition and

12    determines -- or tentatively determines that it

13    should be reinstated in -- because it advances the

14    Commission's diversity goals writ large, even if

15    not specific to minority ownership, the Commission

16    tentatively determined that it cannot adopt the

17    socially disadvantaged business determination --

18    definition, because it doesn't have evidence to

19    sustain such a rule under strict scrutiny and the

20    Commission tentatively decided --

21            THE COURT:  Wait a minute.  Because

22    why?  If it doesn't affect -- if socially and

23    economically disadvantaged doesn't deal on its face

24    with race, or gender, then what's the problem?

1          MR. GOSSETT:  That rule does

2   explicitly deal with race.  There's a separate

3   overcoming disabilities proposal that isn't

4   explicitly race based.

5          THE COURT:  Which is the presumption.

6          MR. GOSSETT:  The Commission

7   tentatively concludes that that rule is unworkable

8   and inconsistent with First Amendment values.

9   That's in paragraph 399 at JA-137.

10         THE COURT:  Look, you've got Congress

11  with 309(j) saying that you have to promote

12  opportunities for businesses owned by members of

13  minority groups.  That's from Congress.  That's not

14  from us.

15         And then in '94 the Supreme Court

16  decision in Turner Broadcasting says that assuring

17  that the public has access to a multiplicity of

18  information sources is an interest of the highest

19  order.  That's not from us.

20         So we've got these big authorities out

21  there telling us, and they have the authority to

22  tell us, you've got to do something.  And all we're

23  seeing here today is it's taking longer than people

24  are willing to put up with, longer than what the

1    statute has said.  And you're saying all we're

2    delaying is 2010.  But we're now six years from

3    2010.

4         Now, I realize they often come out

5    late.  But it's getting to the point where it's

6    just the opposite of the beginning of the Roosevelt

7    administration, which is we're going to do

8    something, and if it doesn't work we're going to do

9    something else.  Here it sounds like we're going to

10   do nothing, and if you complain we're going to

11   continue to do nothing.

12        MR. GOSSETT:  Respectfully, the

13   quadrennial obligation is not applicable to this

14   discussion.  The eligible entity rules are not the

15   rules subject to the four-year obligation.  Those

16   are rules that we have done independent of 202(h).

17   So the four-year clock on these comes from this

18   court's merging the two.

19        And beyond that -- look, we're

20   constrained -- obviously the Commission has

21   repeatedly said it is committed to increasing the

22   low levels of minority ownership in mass media.

23   But we're constrained by the Supreme Court saying

24   that we're subject to strict scrutiny.  The D.C.

```
 1    Circuit has suggested that viewpoint diversity --

 2                 THE COURT:  For race, right?

 3                 MR. GOSSETT:  For race.

 4                 THE COURT:  But not for gender.

 5                 MR. GOSSETT:  Not for gender, but the

 6    two, some think that the gender standard is coming

 7    into the same.  But regardless, there's no evidence

 8    to support taking action with respect to gender

 9    either at this time.

10                 THE COURT:  And conceivably they may

11    have to go back and take a look at Adarand

12    because -- to clarify it, if nothing else.  You've

13    got the same types of issues, for example, with

14    Fisher with the University of Texas.  And who

15    knows?  That -- that's why they get paid the big

16    bucks.

17                 But the point being, the mandate that

18    we have before us is something has to be done,

19    something has to be proposed.  And it can't just be

20    slow walked much longer.

21                 MR. GOSSETT:  Your Honor, that's why,

22    again, the Chairman is committed to resolving all

23    of these issues in the near future.

24                 THE COURT:  What if we were to agree
```

1    with Mr. Philbin and conclude that the JSA cannot

2    stand because it's never been put to the public

3    interest test?  What would be the FCC's next move

4    with regard to that rule?

5             MR. GOSSETT:  Can I challenge the

6    presumption behind that question before I -- I

7    mean, if we have not --

8             THE COURT:  You can challenge it, of

9    course, but it was a hypothetical.

10            MR. GOSSETT:  Sure.

11            THE COURT:  Supposing if we --

12            MR. GOSSETT:  If we had not determined

13   in our rule making that something was in the public

14   interest, it would presumably fall under the

15   Commission's general rule-making authority.

16            Again, that is not a question that's

17   subject to Section 202(h), though.  And this is

18   important because this goes to why it was okay for

19   us to do these rules at this time.

20            The Commission has never thought of

21   attribution rules as the -- it's always thought of

22   attribution rules as being separate and apart from

23   ownership rules.

24            So when we attributed the radio

```
 1   JSAs --
 2               THE COURT:  I'm sorry.  You never
 3   thought of it as separate and apart?
 4               MR. GOSSETT:  We always thought -- I'm
 5   sorry.  I corrected myself mid-sentence to try to
 6   be more explicit.
 7               THE COURT:  It is a part of.
 8               MR. GOSSETT:  We always thought of
 9   them as separate.
10               THE COURT:  Always separate.
11               MR. GOSSETT:  Always thought of the
12   attribution rules and ownership rules as separate,
13   and when --
14               THE COURT:  Doesn't it qualify the
15   ownership rules?
16               MR. GOSSETT:  The ownership rules
17   determine the levels of concentration of ownership
18   that the Commission has determined are in the
19   public interest.
20               The attribution rules go to ensuring
21   that those levels are followed.  So the attribution
22   rules are ways of ensuring that there isn't evasion
23   of those ownership rules, so --
24               THE COURT:  If the ownership rules did
```

| | |
|---|---|
| 1 | not exist, would the joint sales agreements have |
| 2 | any relevance? |
| 3 | MR. GOSSETT:  No, your Honor. |
| 4 | THE COURT:  So there is -- |
| 5 | MR. GOSSETT:  But the reason the |
| 6 | Commission adopted the joint sales agreement rule |
| 7 | and was explicit about this is because entities |
| 8 | started using joint sales agreements to evade the |
| 9 | existing ownership rules that the Commission has |
| 10 | repeatedly defended and that this court -- this |
| 11 | court affirmed the current TV ownership limits in |
| 12 | 2011. |
| 13 | So these are not rules -- limits that |
| 14 | are of ancient ilk.  And when the Commission |
| 15 | determined that people were using joint sales |
| 16 | agreements to evade those existing limits, it was |
| 17 | appropriate for the Commission to attribute them. |
| 18 | What Mr. -- |
| 19 | THE COURT:  Is there record support |
| 20 | for that?  Because it seems to me it's pretty thin. |
| 21 | MR. GOSSETT:  Is there record support |
| 22 | that they were being used as a method of evasion? |
| 23 | THE COURT:  Yes.  Yes. |
| 24 | MR. GOSSETT:  Yes.  And that was the |

1    analysis the Commission had undertaken with respect

2    to the TV local market agreements, with respect to

3    the radio JSAs, and again here.  The Commission

4    analyzes questions of influence and control

5    analytically.

6            It has never been able to point to

7    specific evidence that this station is

8    inappropriately influencing that station.  It looks

9    to the relationships.

10            THE COURT:  Okay.  I understand that.

11    That's the key to your argument, that as long as

12    there's an opportunity and an incentive to exercise

13    power and control, that's sufficient, you don't

14    need any evidence showing that that, in fact, has

15    taken place.

16            So it's almost like a per se rule.  If

17    you have the power, we're going to presume that

18    you're going to use it and it's wrong.  But is that

19    the right way to evaluate the effect of these JSAs?

20            MR. GOSSETT:  The Commission

21    implements rules -- the whole theory of a rule is

22    that it is done on an across-the-industry basis.

23            The Commission acknowledges that the

24    broadcasters were asserting that there were public

1    interest benefits of some joint sales agreements,

2    and said most of the benefits they were talking

3    about were benefits that basically were arguments

4    about loosening our overall ownership limits.

5            So, I mean, this is most evident in

6    the ICLE amicus brief before this court, which

7    talks about the benefits of joint sales agreements

8    and duopolies.  They don't mince any words.  They

9    think that the ownership limits should be reduced.

10           The benefits alleged with respect to

11   joint sales agreements are the benefits of combined

12   ownership, in essence.

13           So the Commission concluded, and in

14   making the public interest determination that it

15   did, was that these joint sales agreements, quote,

16   should not be used to circumvent our local

17   broadcast ownership rules which are designed to

18   promote competition.

19           THE COURT:  Sure.

20           MR. GOSSETT:  That's at JA-168.

21           THE COURT:  And so you acknowledge

22   that they've been beneficial in many cases; they've

23   helped struggling companies, struggling stations.

24           MR. GOSSETT:  Respectfully, we didn't

1    acknowledge that they have been beneficial, we

2    acknowledged that people have made arguments about

3    their benefits.

4           We said that to the extent in the

5    specific instance someone wanted -- thought there

6    were benefits that warranted a waiver of the

7    ownership limit, they could seek a waiver.  And we

8    said that generally the arguments about this were

9    arguments about our ownership limits and that

10   nonetheless was not a valid basis for seeking to

11   evade those ownership limits.

12          I do also want to point out with

13   respect to the argument about the time nature of

14   this, Congress has since grandfathered existing

15   joint sales agreements to 2025.

16          So to the extent someone is a member

17   of a joint sales agreement today -- a party to a

18   joint sales agreement today and thinks that we

19   inappropriately are changing, are making them get

20   out of that before we next review the overall

21   ownership limits, we're not.  We're going to be

22   reviewing those this year and doing so in light of

23   this.

24          But it's also worth noting that that

1    congressional statute grandfathering existing joint

2    sales agreements implicitly endorses the

3    Commission's view that these joint sales agreements

4    are attributable interests.

5              THE COURT:  Well, but it was -- you

6    were giving them two years before.

7              MR. GOSSETT:  Yes, we originally gave

8    them two years, which is also what we had done with

9    radio JSAs.

10             THE COURT:  Congress's action can also

11   be read to say that they didn't like the two-year

12   period, they wanted a much longer period.

13             MR. GOSSETT:  Well, clearly they

14   didn't like the two years.  My point is that they

15   didn't disagree with us that generally joint sales

16   agreements should be attributed, which is our

17   broader dispute here with Mr. Philbin.  We think

18   that the decision to attribute was reasonable.

19             THE COURT:  Why did the Commission

20   feel that it had to take action now if even though,

21   even accepting your argument that they're separate,

22   they have some connection, there's some link with

23   the ownership rules, why not wait until you make

24   the change or make no change on the ownership rules

1   and then deal with the JSAs, then maybe the SSAs

2   too?

3          MR. GOSSETT:  Because the Commission

4   thought it had an interest in preventing evasion of

5   existing rules.  That's an interest separate and

6   apart from the overall question of where limits

7   should be.

8          If we set a limit, we shouldn't --

9   people shouldn't be allowed to engage in creative

10  lawyering to avoid that limit.  And we said the

11  limit is here.  We said that except in certain

12  circumstances you couldn't own more than two

13  stations or couldn't own two stations.  And people

14  were engaged in behaviors that were designed to do

15  essentially what we had otherwise barred them from

16  doing.

17         So it was reasonable to stop that

18  practice then and there.  Remember, this is also

19  something that the Commission had given notice we

20  might do in 2004.

21         THE COURT:  Except you're doing it on,

22  you're doing it on an abstract basis.

23         MR. GOSSETT:  I'm sorry, your Honor.

24         THE COURT:  You said -- you talk about

```
 1    the evasion.  But as I understand it, the rationale

 2    behind is that there is power to evade but not

 3    necessarily that there has been evasion.

 4              MR. GOSSETT:  The Commission had

 5    reviewed many joint sales agreements in the course

 6    of its merger reviews over the prior decade.

 7              The Commission had reviewed radio JSAs

 8    and had previously determined to attribute them.

 9    The Department of Justice, which had also reviewed

10    television JSAs, filed ex-parte comments in this

11    proceeding saying you should attribute JSAs.  GAO,

12    when it looked at this, also agreed that the

13    attribution of JSAs was reasonable.

14              The petitioners here cite to GAO

15    allegedly criticizing the Commission.  They did

16    not.  They talked about how the Commission hasn't

17    yet defined shared service agreements and how

18    that's something we should do going forward.

19              THE COURT:  It seems to me that they

20    were somewhat critical of your monitoring function

21    of the JSAs.

22              MR. GOSSETT:  In the most recent -- in

23    the order last month, yes, they said that we should

24    start monitoring more closely that, and the
```

**JAMES DeCRESCENZO REPORTING, LLC**

1    Commission agreed in its comments in response to

2    that note.  But nothing about that GAO report

3    suggested that GAO had any problem with our overall

4    rule making or approach to joint sales agreements.

5                   THE COURT:  Thank you.

6                   MR. GOSSETT:  Thank you, your Honors.

7                   THE COURT:  Ms. Campbell.

8                   MS. CAMPBELL:  One of the reasons the

9    Commission has been taking so long is that they

10   still haven't completed the earlier docket, 07-294,

11   the diversity docket, which was part of the 2006

12   quadrennial review.  And their recent action in

13   January took care of some of those issues but not

14   all.

15                   But further -- in that order, they

16   made clear that their data that they had already

17   collected was not accurate, and instead of making

18   that decision known a month earlier or a few months

19   earlier when it could have affected the 2015

20   filing, it simply didn't do that.  There's no

21   excuse.  It surely knew about that for at least

22   three years.

23                   Now, the Commission, in the notice,

24   says they're going to do two things.  They're going

```
 1    to get the data in good shape; they haven't.  They

 2    don't have a database, for example.

 3              They said they were going to do

 4    studies.  Well, the only study they mention was the

 5    Hispanic television study which they had announced

 6    in 2013.  That study has still not been done, as

 7    far as I know.

 8              THE COURT:  When were studies 7, 8A,

 9    and 8B done?

10              MS. CAMPBELL:  Those were earlier.

11    Those were earlier.  And the problem with the

12    earlier studies were, they just didn't have enough

13    data, or the data wasn't reliable enough to draw

14    reliable conclusions.

15              And we've been in, talking to the

16    Commission all along.  And one of the things that

17    they would tell us is, well, we can't show that --

18    race of owners affects diversity because there

19    aren't enough minority owners for to us have

20    statistically significant results.

21              Now, to me, that illustrates exactly

22    what the problem is.  If there's so few that you

23    can't even study it, then you have a problem.

24              I'm not sure that's true as a matter
```

1    of statistics; I've been told otherwise.  And,

2    also, I think the Commission has a real

3    misconception about what -- showing what it would

4    need to show.

5              I will point out just recently that

6    the Small Business Administration declared that

7    women-owned businesses in telecommunication could

8    qualify as SDBs, so that's certainly possible.

9              As far as Mr. Philbin goes, he's wrong

10   when he says there's no evidence.  There's tons of

11   evidence.  We cite it in our brief.

12             Most situations where there's a JSA

13   there's also an SSA, and so they're providing all

14   of the local news.  I don't know how can you

15   influence a station's programming more than

16   providing the local news.

17             Furthermore, the bureau itself, right

18   before this order, issued a public notice saying

19   we're going to be looking at these very carefully.

20   So they know about this.  They just have turned a

21   blind eye to these for a long time, just as with

22   the problem with minorities and women.

23             And then as far as Ms. Walker's

24   request that the Court vacate the rules, well, I

1    don't see how the Commission could do that under

2    202(h) without analyzing what impact that would

3    have on the opportunities for minorities and women

4    which would be, quite frankly, devastating.

5            And then to say, well, they can always

6    reinstate the rules is really no answer because you

7    see how difficult it is to turn back the clock just

8    with the JSAs.  You know, reinstating rules once

9    they're gone is -- it would really be practically

10   impossible.

11           Thank you.

12           THE COURT:  Okay.  Thank you.

13           Ms. Walker.

14           MS. WALKER:  Your Honor, I'll be

15   quick.  Mr. Gossett stood here and acknowledged the

16   mandatory, statutory duty that the Commission bears

17   under 202(h).  His inability to give you a clear

18   answer to your simple question as to when this

19   might happen is, to put it charitably, telling.

20           I'd like to clarify something, though,

21   about what it means for an order to be circulated

22   to the Commission, which the Chairman has said

23   would happen by this June.

24           That is merely a staff recommendation

1  to the full Commission.  Orders have languished and

2  died before the commissioners, based on media

3  bureau recommendations.  And, in fact, that's

4  exactly what happened with the 2010 review that

5  never got finished either.

6              I would also point you to --

7              THE COURT:  What about the statement

8  that after that staff recommendation goes to the

9  commissioners that they would -- at least the

10 tentative anticipation is that they would have

11 something done by the end of the year?

12             MS. WALKER:  The end of the year with

13 -- first of all, he made no clear commitment to

14 this court, which is quite shocking that one --

15             THE COURT:  I'm not arguing with you.

16             MS. WALKER:  -- would appear without

17 the ability to do that.  The end of this year, with

18 all respect, your Honor, would be too late.  By the

19 end of the year the Commission should have done two

20 quadrennial reviews by that time.

21             And our injury is not academic, your

22 Honor.  Broadcasters are suffering.  We are

23 precluded from achieving these efficiencies that

24 other competitors are not.  Broadcast stations are

1    closing, newspapers are shuttering, and that's not

2    in the public interest.

3                THE COURT:  You've been communicating

4    with the other side, haven't you?  We're just

5    wondering what accounts for this extraordinary

6    delay?

7                MS. WALKER:  Your Honor, I could not

8    tell you.  It's really, I think, up to Mr. Gossett

9    to explain.  But as far as we can tell, nothing has

10   happened even on the 2014 review since the comment

11   cycle was closed a year and a half ago.  If you

12   read the newspapers, if you still read newspapers,

13   Your Honor, you'll see --

14                THE COURT:  I still do.

15                THE COURT:  Me too.

16                MS. WALKER:  -- the Commission has

17   been very busy in lots of other areas that don't

18   involve any mandatory statutory duties.

19                THE COURT:  It's still you can touch

20   The Washington Post, you can touch The New York

21   Times, so.

22                MS. WALKER:  Exactly.  You know, the

23   Commission is engaged in regulation of the

24   Internet, it's about to embark on new regulation of

1    cable providers.  None of that is mandatory.  It's

2    just not interested in complying with Congress's

3    clear directive in 202(h).

4              But one other quick point.  In the

5    Commission's brief, in footnote 7, they referenced

6    a statement by the Chairman in a letter to the

7    Senate in March of 2014.  And this is their own

8    reason for what is happening.

9              They say that the Chairman represented

10   to the Senate that the 2014 review, quote, should

11   be completed in two years.  That's joint appendix

12   1023.  That was last month, your Honors.

13             THE COURT:  Is there anything

14   different that's been said to Congress as to why

15   there's been this delay?

16             MS. WALKER:  Not that I'm aware of.

17             THE COURT:  Okay.

18             MS. WALKER:  And I'm not sure it

19   really matters why, your Honor, given the clarity

20   of the command in 202(h), the Commission's open

21   acknowledgement at joint appendix 2 that they bear

22   this duty.  Congress's command is being cavalierly

23   disregarded.

24             And, again, the injury to my clients

1    is not academic.  Newspapers are struggling,

2    broadcast stations are failing, this is no way to

3    run --

4              THE COURT:  I guess where I'm heading,

5    is Congress threatening to take any action?

6              MS. WALKER:  Not that I'm aware of,

7    but that's why we have the APA in Section 706(I)

8    and this court's ability to compel action on agency

9    decisions that are wrongfully withheld.

10             Absent vacatur, your Honors, if you

11   remand, we would respectfully ask you to attach

12   those three conditions I mentioned.

13             A serious time limit, we think 60 days

14   is appropriate.  The Commission has all the

15   information it needs.  It has had that information

16   for a year and a half.

17             An interim stay to encourage the

18   agency to take your order seriously.

19             And a clear statement that if they

20   don't timely comply with your order on remand you

21   will consider or, in fact, vacate the rules at that

22   time.

23             THE COURT:  Thank you very much.

24             MS. WALKER:  Thank you.

1       THE COURT:  Mr. Philbin.

2       MR. PHILBIN:  Thank you, your Honor.

3   Just some quick points.

4           First, to Mr. Gossett's point that the

5   FCC has always considered the attribution rules as

6   something separate and apart, that, with all

7   respect, is just a form of administrative

8   double-talk, because the attribution rules are a

9   part of the ownership rules; their only function is

10  to define what ownership is for purposes of the

11  ownership rules.

12          They're codified in the rules simply

13  as a note to the ownership rules.  So they can't be

14  extricated and disentangled from the ownership

15  rules themselves.

16          Second, Congress's action in extending

17  the grandfathering period to ten years can't in any

18  way be interpreted as a ratification of what the

19  Commission did.

20          And I would point the Court to Judge

21  Ambro's recent decision in Kaplan vs. St. Peters

22  Healthcare where the Court pointed out that the

23  theory of congressional ratification does not apply

24  where the statute has a plain meaning that is

1    inconsistent with the proposed interpretation.

2              We're not even in the box here where

3    we have an interpretation from the FCC on

4    something, but certainly not on something that's

5    ambiguous.

6              The statutory command here to consider

7    the public interest is totally unambiguous, totally

8    clear from two different statutory sources.

9              Nothing that Congress did to try to

10   avoid a train wreck by putting some emergency

11   legislation on an appropriations rider suggests

12   that it put its imprimatur on everything else the

13   FCC did.

14             And, lastly, your Honor, just on the

15   evidence -- and Judge Scirica asked about the

16   evidence in the record.

17             I would like the Court to note that in

18   trying to defend the FCC's decision, both

19   Mr. Gossett and Ms. Campbell immediately went to

20   things that the FCC did not rely on.

21             The GAO report -- that was concluded

22   outside the record, and Ms. Campbell relied on, she

23   said JSAs are associated with SSAs, and that's why

24   there's some influence here.

1          What the FCC concluded was that it

2    didn't have enough information about SSAs to make

3    any determination on them.

4          So those references have nothing to do

5    with the rationale that the FCC provided for its

6    rule, and it pointed to no evidence showing actual

7    influence.

8          And it even pointed out the critical

9    distinction between radio JSAs and television JSAs

10   when it pointed out that there was no evidence that

11   there were flat-fee arrangements for television

12   JSAs.  It's something we point out in our brief.

13          Going back to the radio JSA rule, that

14   was something critical that the FCC had determined

15   in radio JSAs gave this sort of influence that they

16   were talking about.  When the broker -- brokered

17   station was only receiving a flat fee, it loses

18   incentives over controlling its programming in the

19   radio station.

20          And the FCC pointed out, there wasn't

21   any evidence that that sort of fee arrangement was

22   used here.  But then it said, well, we think there

23   can be influence anyway.  It was all based just on

24   speculation, not on evidence in the record.

1          And most critically, the Court doesn't

2    need to get to considering the evidence because of

3    the threshold statutory violation in failing to

4    consider the public interest standard.

5          THE COURT:  Thank you very much.

6          MR. PHILBIN:  Thank you, your Honors.

7          THE COURT:  Thank you to all counsel

8    for being with us today.

9          I would ask counsel if you would get

10   together with the clerk's office and have a

11   transcript of this oral argument prepared, split it

12   half for this side, half for that side, however you

13   want to divide it up on that side, and we'll go

14   from there, and recess.

15

16

17

18

19

20

21

22

23

24

1                           CERTIFICATION

2

3

4              I, JAMES DeCRESCENZO, a Fellow of the

5    Academy of Professional Reporters, a Registered

6    Diplomate Reporter, Certified Realtime Reporter, an

7    Approved Reporter of the United States District

8    Court and the Court of Common Pleas, hereby certify

9    that I have truly and accurately transcribed this

10   recording to the best of my ability.

11             I further certify that I am neither

12   attorney nor counsel for, not related to nor

13   employed by any of the parties to this action; and

14   further, that I am not a relative or employee of

15   any attorney or counsel employed in this action,

16   nor am I financially interested in this case.

17

18

19
     _____
20   James DeCrescenzo
     Fellow of the Academy of Professional Reporters
21   Registered Diplomate Reporter
     Certified Realtime Reporter
22   Approved Reporter of the United States District
     Court and the Court of Common Pleas
23

24